EXHIBIT 1 TO DECLARATION OF GERALDINE WEISS
IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE
UNDER 28 U.S.C. § 1412

i

```
0001
 1     IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2            COUNTY OF SAN FRANCISCO
 3
 4
 5   SENORX, INC.,                      )
                                        )
 6          Plaintiff,                  )
                                        )
 7      vs.                             ) CASE NO. CGC 04-435849
                                        )
 8   COUDERT BROTHERS, LLP,             )
     and DOES 1-500,                    )
 9                                      )
            Defendants.                 )
10   _____)
11
12
13              DEPOSITION OF
                ANNE MARIE LEAVY
14
                TUESDAY, MARCH 28, 2006
15
                    12:48 P.M.
16
                 One Market Plaza
17                Steuart Tower
                    8th Floor
18         San Francisco, California 94105
19
20
21
22
23
24
25
```

```
0013
 1         MR. DENISTON:  Yes.  You can still answer.  I'm
 2  just making an objection.
 3         MR. HANCOCK:  You can answer.  I'll let you know
 4  if you shouldn't answer a question.  So you're going to
 5  hear us make objections here and there.  Be patient.
 6  We'll put it out.  The court reporter will write them
 7  down, and then everybody will look at you to go ahead and
 8  provide the answer.  Okay?
 9         THE WITNESS:  Okay.
10         So the person handling the foreign filings in
11  2003 was Tara Faenza.
12  BY MS. WEISS:
13     Q   And did Ms. Faenza work with anyone -- well,
14  strike that.
15         When did you first meet Ms. Faenza?
16     A   I believe she started at Coudert Brothers in
17  September or October of '02.
18     Q   And during the time that you worked at Coudert
19  and observed Ms. Faenza working at Coudert, did you form
20  any impression about the capability of Ms. Faenza to do
21  her job duties?
22         MR. DENISTON:  Objection.  No foundation.  Calls
23  for speculation.
24         THE WITNESS:  I was concerned.
25  BY MS. WEISS:
```

```
0018
 1        And if you need to break them down into separate
 2   ones, we can.
 3        A    Well, Tara would show up at 10:00 o'clock or so.
 4   She was doing her modeling on the side, and she was also
 5   trying to get her master's degree at the University of
 6   Phoenix.  So she was just busy with other things, and she
 7   just -- she took on a big responsibility position.  So --
 8        Can you repeat the question.
 9        Q    I was asking about conversations that you may
10   have had or you had with Ms. Der about Ms. Faenza and her
11   ability to adequately perform her job.
12        A    In passing, I guess maybe we would talk, but
13   I -- I don't remember a clear conversation.  It was just
14   a mutual understanding that we were like "Wow."
15        Q    And do you know who was Ms. Faenza's supervisor?
16        A    That would be Don Bartels.
17        Q    And do you know if anybody mentioned it -- if
18   anyone ever complained about Ms. Faenza to Mr. Bartels?
19        A    No.
20        Q    And what did Mr. Bartels do?
21        A    He was a patent attorney as well and he worked
22   in the San Francisco office but he also moved down to
23   Palo Alto and I don't recall when he did.
24        So apparently Don Bartels was in Palo Alto while
25   Tara was in San Francisco.  So he was supervising her
```

```
0019
 1  from Palo Alto.
 2     Q   Have you any knowledge about how he was able to
 3  adequately supervise Ms. Faenza when he worked in a
 4  different office?
 5     A   No.
 6     Q   Did Mr. Bartels divide his time, once he moved
 7  to the Palo Alto office, between the San Francisco and
 8  Palo Alto office?
 9     A   No.
10     Q   Do you know if Ms. Faenza and Mr. Bartels were
11  friends outside the office?
12     A   No.
13     Q   Now, you mentioned Ms. Faenza would come in at
14  10:00 A.M. in the morning.
15         Do you know if that was her assigned time to
16  come in?
17     A   No, I don't.  I don't.
18     Q   Okay.  Do you know if she was able to have some
19  sort of flexibility in her -- in her work schedule?
20         And by that I mean she did not have a set time
21  to come in.  She could control her own hours.
22     A   I think she believed that she could control her
23  own hours, but I think it was standard for everyone to be
24  there at least by 9:30.  So it was a 9:30 to 5:30.
25         We actually worked seven and a half hours at
```

```
0077
 1     Q   All right.
 2     A   She was a very impressive person.  So we were
 3  all impressed.
 4     Q   Okay.  So it would be accurate to say then that
 5  sometime in early May of 2003 you formed the impression
 6  that she was disorganized?
 7         MS. WEISS:  Objection.  Form of the question.
 8  Assumes facts not in evidence.  Lacks foundation.
 9  Leading.
10  BY MR. DENISTON:
11     Q   You can answer it.
12     A   Yes.
13     Q   Now, did you ever communicate to Mr. Lynch the
14  concerns you had about Ms. Faenza?
15     A   I can't recall.  I did express concerns.
16     Q   To Mr. Lynch?
17     A   But it wasn't to Mr. Lynch.
18     Q   All right.  Okay.
19     A   It was to Lillian Nakagawa.
20     Q   Who's Lillian Nakagawa?
21     A   She was -- she was in the interim, acting as
22  managing partner.
23     Q   She's a lawyer?
24     A   A partner.  Yeah.
25     Q   Partner.  All right.
```

```
0078
 1           And when -- would that have been sometime in
 2   May, 2003?
 3       A   Yes.  Yes.  It was before our move.
 4       Q   Okay.  And what did you tell Ms. Nakagawa about
 5   your concerns about Ms. Faenza?
 6       A   Well, I -- I had a conversation with Tara
 7   because she was upset over something, and I went to her
 8   and I said, "Are you okay?"  And she's, like, yeah.
 9           And we talked about how her behavior wasn't
10   appropriate for our law firm, the way she carried on most
11   of the time, and she was pretty frank about it and she
12   said that she's really surprised nobody has reprimanded
13   her and she was concerned herself that she wasn't being
14   supervised by anyone -- Tara.
15           So I was just getting fed up because it was
16   pretty crazy at Coudert Brothers, and Ed didn't want to
17   hear stuff like that.  Well -- well --
18           So I guess I just went straight to Lillian
19   because Lillian -- well, she was just very concerned.
20   She was like a mother.  She was very concerned about all
21   the employees.  She was very nice.
22           So when I went to her, I expressed that, you
23   know, Tara does have temper tantrums; and, you know, even
24   David Mendoza couldn't believe how -- and she would just
25   be yelling and screaming on the phone and then she'd just
```

```
0079
 1  get up from her office and just walk over to David and
 2  he's like "How're you doing," and her whole misdemeanor
 3  would change completely once she approached -- I mean she
 4  was just a tyrant on the phone, but to you she wouldn't
 5  be like that.  But still we --
 6          MR. HANCOCK:  Just Listen to his question.
 7          THE WITNESS:  Well, I didn't express any concern
 8  to Ed Lynch, but I did express concern to Lillian.
 9  BY MR. DENISTON:
10     Q   I think what you said -- and correct me if I'm
11  wrong -- but I think you said you mentioned to Lillian
12  that Ms. Faenza had temper tantrums.
13          Do I understand you correctly?
14     A   Yeah.  Yeah.
15     Q   Okay.  Did you mention any other concerns you
16  had about Ms. Faenza to Ms. Nakagawa in May of 2003?
17     A   No.
18     Q   What did Ms. Nakagawa say when you told her
19  about the temper tantrums?
20     A   She was -- she knew nothing about it.  So she
21  was just "Thank you for informing me."  She was not
22  aware.
23     Q   Okay.
24     A   But my point was that Tara knew herself she
25  wasn't being supervised at that firm.
```

```
0080
 1         MR. HANCOCK:  When you finish this line of
 2  questioning, can we take a break for a minute.
 3         MR. DENISTON:  I'm not finished.
 4         MR. HANCOCK:  That's fine.  That's why I say
 5  when you finish your line of questioning.
 6  BY MR. DENISTON:
 7     Q   Now, you said that you told Ms. Nakagawa about
 8  your concerns as you've described them.  You told --
 9  well, scratch all that.
10         You've testified that you told Ms. Nakagawa
11  about your concerns about Ms. Faenza's temper tantrums,
12  and you also testified that you did not tell Mr. Lynch
13  about any of your concerns.
14     A   I don't recall telling Mr. Lynch.
15     Q   Okay.  You also testified that Mr. Lynch doesn't
16  "want to hear stuff like that."
17         What did you mean when you said Mr. Lynch
18  doesn't "want to hear stuff like that"?
19     A   That's my impression.  He doesn't want to hear
20  about just nitpicking and, you know -- I don't know --
21  pettiness that goes on.
22     Q   Is it your impression that Mr. Lynch didn't want
23  to hear about somebody being disorganized?
24         MS. WEISS:  Objection -- that form of the
25  question.  Lack of foundation.  Assumes facts not in
```

```
0083
 1          (At 3:17 P.M. a break was
 2          taken until 3:24 P.M.)
 3  BY MR. DENISTON:
 4     Q   Earlier in your deposition you testified that
 5  Don Bartels was Ms. Faenza's supervisor.
 6          Why did you believe Mr. Bartels was
 7  Ms. Faenza's supervisor?
 8     A   Because Tara had told me.
 9     Q   Who supervised Ms. Faenza with respect to the
10  work she was performing for Mr. Lynch?
11          MS. WEISS:  Objection.  Form of the question.
12  Calls for speculation.
13          MR. HANCOCK:  Join.
14          THE WITNESS:  Ed Lynch.
15  BY MR. DENISTON:
16     Q   Okay.  When you left on June 20 --
17          When you left Coudert Brothers on June 20, was
18  Mr. Lynch still there or had he already left?
19     A   He was still there.
20     Q   Okay.  You testified you joined Duane Morris on
21  June 23.
22          Was Mr. Lynch at Duane Morris on June 23?
23     A   Yes.
24     Q   So you and Mr. Lynch both started, as far as you
25  know, at Duane Morris on the same day, June 23?
```

```
0096
 1  managing partner?
 2     A   I can't recall.
 3     Q   And did you ever mention to Ms. Nakagawa
 4  anything else about Faenza's inappropriate behavior other
 5  than the temper-tantrum stuff?
 6     A   It was mostly just her temper tantrums on the
 7  phone and in front of the photocopy machine.
 8     Q   Was that when she was kicking the photocopy
 9  machine?
10     A   Yes.
11     Q   When you said "It was mostly," was it
12  exclusively that, or did you mention anything else to
13  Lillian Nakagawa?
14     A   I don't recall mentioning anything else.
15     Q   And was this -- can you remember the date of
16  that conversation with Nakagawa?
17     A   I can't remember the exact date, but it was a
18  very stressful time because we had just moved from --
19         MR. HANCOCK:  Just listen to her question.
20         THE WITNESS:  Can you repeat the question.
21  BY MS. WEISS:
22     Q   I'm just trying to pinpoint a date when you
23  mentioned your concerns about Ms. Faenza to Ms. Nakagawa?
24     A   It would have been sometime at the end of May or
25  the beginning of June.
```

0097
1  Q   And did Ms. Nakagawa say anything other than
2  indicate she had not known?
3  A   She didn't say anything else.
4  Q   Did she say she was going to do anything about
5  the unprofessional behavior?
6  A   She didn't tell me.
7  Q   Okay.  And as the ruling managing partner at
8  that time, do you have any knowledge who Ms. Nakagawa
9  discussed this with?
10  A   I do not.
11  Q   And wasn't Mr. Hebert the managing partner of
12  the San Francisco office at that time?
13      MR. DENISTON:  Objection.  No foundation.
14      MS. WEISS:  Do I have to go through the -- I
15  think we just showed the letter that was cc'd to Hebert.
16      MR. DENISTON:  She hasn't testified about
17  Mr. Hebert in this whole deposition.
18      MS. WEISS:  Well, I think it's in evidence
19  without the depo.
20  Q   Was Mr. Hebert the managing partner as well at
21  that time?
22  A   Yes.
23  Q   How many managing partners were there at the
24  San Francisco office, if you know?
25  A   My time there, there was three.

0099
1    A    Well, the way she handled herself on the phone.
2    Q    Uh-huh.
3    A    We also discussed that I don't think she
4  understood her job description when she took on the job.
5    Q    Could you explain that to me, please.
6    A    Yeah.  When she took this job, she thought she
7  was the patent administrator and she was going to manage
8  everybody, the staff, and that was not the job
9  description.
10   Q    And did she indicate -- was it Mr. Bartels that
11  had hired her, as far as you know?
12   A    And Becky Robinson.
13   Q    And was there anything else that you discussed
14  with her when you discussed her inappropriate behavior in
15  the law firm?
16   A    I do recall trying to explain to her what her
17  job description was to be based on the position she took
18  from the girl ahead of her.
19   Q    Was that Jordan?
20   A    Yes, it was.  And she took care of everything
21  that had to do with anything foreign, and that was also
22  Tara's position as well.
23   Q    Did Ms. Faenza seem to think that it was not her
24  job to take care of all the foreign filings, as far as
25  you could tell from that conversation?